**CLARK SMITH VILLAZOR LLP**
Rodney C. Villazor
Christopher J. Clark (*PHV* application forthcoming)
Jeffrey D. Rotenberg (*PHV* application forthcoming)
666 Third Avenue, 21st Floor
New York, New York 10017
Telephone: (212) 377-0850
Facsimile: (212) 377-0868
rodney.villazor@csvllp.com
clark@csvllp.com
jeffrey.rotenberg@csvllp.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT DISTRICT OF NEW JERSEY

| | |
|---|---|
| ALTA FUNDAMENTAL ADVISERS LLC, ALTA FUNDAMENTAL ADVISERS MASTER LP, ALTA FUNDAMENTAL ADVISERS SP LLC, BLACKWELL PARTNERS LLC, and STAR V PARTNERS LLC,  Plaintiffs,  v.  PAUL BISARO, JASON GOODSON SIGURDUR OLAFSSON, BRYAN M. REASONS, and DANIEL SPECIALE,  Defendants. | Case No. _____  **COMPLAINT**  **JURY TRIAL DEMANDED** |

Plaintiffs, by their undersigned attorneys, bring this action against Defendants Paul Bisaro, Jason Goodson, Sigurdur Olafsson, Bryan M. Reasons, and Daniel Speciale, and allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through Plaintiffs' attorneys, which included a review of public documents, conference calls,

1

and announcements made by Mallinckrodt plc or its various subsidiaries (collectively "Mallinckrodt" or the "Company") and Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Mallinckrodt, analysts' reports and advisories about the Company, media reports, and other publicly available information, including filings and testimony in Mallinckrodt's Chapter 11 bankruptcy case. Plaintiffs' claims are also based on their direct communications with Mallinckrodt officers and employees. Plaintiffs believe that a reasonable opportunity for discovery will provide additional evidentiary support for their claims.

## NATURE OF THE ACTION

1.      After emerging from a long and contentious bankruptcy proceeding in June 2022, Mallinckrodt and certain directors, officers and employees of the Company spun and perpetuated a fanciful tale to attract and maintain equity investors in the Company for their own benefit. In reality, Mallinckrodt was in distress nearly immediately upon its emergence from bankruptcy. Soon thereafter, the Company required another restructuring that would again wipe out the value of its common stock. Mallinckrodt and Defendants concealed this all from the market, including Plaintiffs, until the *Wall Street Journal* blew the whistle in early June 2023. By this lawsuit, Plaintiffs, which purchased Mallinckrodt common stock in reliance on Mallinckrodt's and Defendants' knowingly and negligently false and misleading statements, seek to hold Defendants liable for losses resulting from the stock's precipitous decline after the reveal and disclosure of the unlawfully concealed material information regarding the Company's financial condition.

2.      In 2020, Mallinckrodt faced billions of dollars in liability resulting from the

manufacture and sale of opioids[1] and improper billing practices involving its Acthar Gel drug.[2] Its strategic response was a Chapter 11 bankruptcy filing in Delaware. In June 2022, Mallinckrodt emerged with a bankruptcy plan that wiped out the Company's stockholders. The plan's selling point was the reduction of the Company's liabilities and debt, including in connection with its exposure from the opioid crisis. The Company achieved this outcome by agreeing in this bankruptcy plan to make a series of payments over several years to the "Opioid Trusts" formed on behalf of opioid claimants. The problem was that the projections relied upon to support this bankruptcy plan could not hold water, which Defendants knew. In response, Defendants undertook to shield from the market the fact that the Company's inability to meet these projections meant the Company was saddled with too much debt for long-term survival and was destined to return to bankruptcy.

3.       In response, Defendants schemed to keep things afloat sufficiently long enough to secure a payout from creditors through a second bankruptcy process. Defendants maneuvered their financially terminal Company to benefit these creditors prior to and following the Company's ultimate bankruptcy filing in August 2023. Doing so required keeping existing and prospective stockholders on board sufficiently long enough to position themselves for remuneration. As they could not tell equity holders of their scheming, they lied affirmatively and by omission up through the May 2023 first quarter disclosures and into June when the *Wall Street Journal* blew their cover.

---

[1] According to the National Institute on Drug Abuse, "Opioids are a class of drugs that include synthetic opioids such as fentanyl; pain relievers available legally by prescription, such as oxycodone (OxyContin®), hydrocodone (Vicodin®), codeine, morphine; the illegal drug heroin; and many others," and the "[u]se of opioids … is a major driver of the drug overdose crisis in the United States." NATIONAL INSTITUTE ON DRUG ABUSE, https://nida.nih.gov/research-topics/opioids, (last visited on Aug. 28, 2024).

[2] "Acthar Gel is a treatment for people living with certain chronic inflammatory or autoimmune conditions," such as forms of arthritis, lupus, dermatomyositis and polymyositis. ACTHAR GEL, *What is Acthar Gel?*, https://www.acthar.com/about-acthar-gel/, (last visited on Aug. 28, 2024).

4.      Mallinckrodt emerged from bankruptcy bullishly in June 2022, with Defendants Chief Executive Officer and Director, Sigurdur "Siggi" Olafsson, long-time Chief Financial Officer Bryan Reasons, and Board of Directors (the "Board") Chairman Paul Bisaro at the helm. In consultation with Investor Relations Chief Defendant Daniel Speciale, Head of Corporate Development Defendants Jason Goodson, and others, these Defendants spoke to the market and investors about the Company's "attractive pipeline, enhanced financial flexibility and significant opportunities to drive stakeholder value." They described the Company as "well-positioned for long-term success, with a substantially stronger capital structure and major litigation matters permanently resolved." They promised "value to stakeholders." When it came to the Company's actual and prospective equity holders, that of course necessarily meant an increased stock price over the long term (and obviously, not a quick collapse to zero).

5.      Defendants repeatedly made these and other assurances for nearly a year after Mallinckrodt emerged from bankruptcy, knowing of or with disregard to their falsity. They emphasized that the Company's financial position was stable and improving. These assurances culminated in the Company's SEC Form 10-Q for the First Quarter of 2023. Therein, Mallinckrodt wrote that it "believe[s] that our sources of liquidity are adequate to fund our operations for the next twelve months and foreseeable future." But it was not long before reports emerged of another restructuring. And if the first bankruptcy was any lesson, that would mean the end of the Company's equity class.

6.      Mallinckrodt's problem was that the financial benchmarks and measures of growth and health that it touted to the market, including to Plaintiffs, were based on undisclosed assumptions that Defendants knew or were negligent in failing to recognize would not manifest. As a result, the Company's financial and related public statements were not true when made.

7.      On May 9, 2023, Mallinckrodt held a conference call for investors to review and discuss its earnings for the first quarter of its fiscal year 2023 and its prospects for the future. Olafsson and Reasons participated in this call on behalf of the Company, along with Speciale.

8.      Mallinckrodt's first quarter, which had ended March 31, 2023, and the ensuing near six weeks before this investor call, made clear to Olafsson, Reasons, Speciale, and everyone else at the Company with access to information regarding its financial condition, including Bisaro and Goodson, that Mallinckrodt was in severe distress and likely insolvent as it would admit in the bankruptcy proceedings to follow.  This could not and certainly should not have been a surprise to Company management and its Board.  Mallinckrodt had been teetering on the brink since the day it emerged from bankruptcy in June 2022, with liability management studies and exercises, an ongoing strategic review focused on its balance sheet, and outside restructuring advisors being core features of the day-to-day at the Company, and regular Board of Directors and Board Committee meetings.

9.      What Defendants said on this call, however, gave Plaintiffs and the investing public no indication that this was the case.  To the contrary, Defendants Olafsson, Reasons and Speciale, on behalf of Mallinckrodt, continued to sell a success story -- rather than the truth.  In fact, the Company had been heading down the path to another bankruptcy filing and the bell was finally about to toll.

10.      Olafsson was front and center on the earnings call.  He celebrated how "Mallinckrodt began the year well" and expressed that he was "confident that we will continue to make good progress throughout 2023."  Olafsson emphasized that he could "personally attest to the strides we have made across the company to put the business into a stronger position for the future."  He added that "[w]hile we need to stay intensely focused on our goals and

priorities, it gives me a great pride to see what our teams have already achieved." Olafson concluded that he was "look[ing] forward to all that we will accomplish the remainder of the year for our patients and each other." Olafsson's statements were materially false and misleading and he, his fellow Mallinckrodt executives, and Board members, knew it.

11.     The Company, including senior executives, would admit in Bankruptcy Court filings and open court only a few months later that at the time of this 2023 first quarter investor call, the Company was "insolvent" and had no answer for meeting its "debt and settlement obligations." Mallinckrodt knew by its own admission, as described in a declaration Goodson submitted in the bankruptcy case, that it "faced an imminent need to restructure" its financial obligations by the end of the first quarter of 2023 (March 31, 2023) – about six weeks before this earnings call. By the earnings call, Mallinckrodt and Defendants had basically given up, yet continued to act like nothing was wrong. Mallinckrodt's disclosures–over which Defendants had control and for which they had responsibility throughout–by Goodson's admission, said nothing about an imminent need to restructure financial obligations and the dire ramifications of failing to do so. The disclosures said nothing about Mallinckrodt's liquidity limitations and inability to refinance maturities looming, which amplified its going concern risk.

12.     In fact, the situation was so dire that Mallinckrodt jumped immediately at a self-interested restructuring plan proposed by certain Mallinckrodt creditors. This plan offered Defendants the opportunity to protect their compensation, including the value of their equity awards. Meanwhile, the plan would see Mallinckrodt equity holders, whom Defendants had wrongly induced to purchase and hold Mallinckrodt stock, wiped out.

13.     Even still, the Company itself did not own up to the truth for weeks after the

first quarter earnings announcement.  Meanwhile, Plaintiffs and others continued to acquire Mallinckrodt stock in reliance on the Company's false and misleading statements about the Company's financial condition and prospects.

14.    While Defendants and the Company sought to keep things under wraps, on June 2, 2023, *The Wall Street Journal* published an article with the headline "Mallinckrodt Explores Repeat Bankruptcy as $200 Million Opioid Payment Comes Due."  The article revealed that Mallinckrodt was "considering another bankruptcy filing as it faces a $200 million payment part of a $1.7 billion opioid-crisis settlement agreed to last year when the company filed for chapter 11 protection."  Mallinckrodt's stock price unsurprisingly collapsed on this news – which was so stunningly inconsistent with the Company's messaging since its emergence from bankruptcy a year earlier.  Only then, on June 5, 2023, did Mallinckrodt start to reveal the truth. Its share price dropped approximately 40% that day.

15.    Finally, on June 15, 2023, Mallinckrodt disclosed what Defendants and other members of the Board and management had known, recklessly disregarded, or should have known for a long time and had failed to disclose as required: enormous and unmanageable debt meant Mallinckrodt was heading straight to bankruptcy for the second time in about a year. Mallinckrodt said it was defaulting on bond interest payments on two bonds and was facing a bankruptcy filing.  Mallinckrodt's stock price dropped another 30% that day, down to under $1 per share.

16.    On June 23, 2023, Mallinckrodt made another disclosure, including events and decisions that had preceded its June 15, 2023, disclosure regarding its financial distress. According to the Company, on June 14, 2023, "the Board," which was headed by Bisaro and included Olafsson, approved a variety of actions and programs focused on executive retention

7

and incentive matters "in anticipation of a potential bankruptcy filing." Defendants and others at the Company had taken steps to position themselves to avoid the consequences of the Company's upcoming bankruptcy filing. In other words, having misrepresented the seemingly inevitable to the market, they were maneuvering to protect their compensation while other equity-holders were going to be left with nothing for a second time. Ultimately, Defendants received retention bonuses, additional financial compensation, and shares in the Mallinckrodt entity that emerged from bankruptcy to replace the millions of dollars in shares they lost. They all even kept their jobs as a reward for leading the Company into bankruptcy (for some, their second bankruptcy at the Company in leadership roles).

17.    On August 23, 2023, Mallinckrodt announced the signing of a restructuring support agreement and an agreement with certain creditors to file a "prepackaged" bankruptcy. Then, on Monday, August 28, 2023, Mallinckrodt announced that it had filed for bankruptcy again and trading of its stock was halted. The Company's bankruptcy petition set up Defendants for a substantial payday, while leaving shareholders who had bought into the fiction peddled following Mallinckrodt's emergence from bankruptcy a year earlier, with zero.

18.    The Company admitted in its effort to secure a quick, nearly uncontested confirmation of its 2023 bankruptcy plan that it had been in "financial distress," "would run out of cash in early 2024," and was confronting "a going-concern opinion that would cause a default and then cross-default of all our debt, making it immediately due." It further admitted that "if that didn't happen, [it] had a 2025 maturity of $800 million that [it] would not have cash to repay." The Company had been facing "disaster" in its own words in open court. The Company admitted it had been materially untruthful with real-time public statements suggesting nothing of the sort. In fact, the Company, including Defendants, the Company's leaders, were declaring

just the opposite.

19.    In sum, upon emerging from bankruptcy in June 2022, Mallinckrodt repeatedly assured investors of the Company's financial strength, including purported enhancements to its liquidity and balance sheet, as well as its overall prospects for continued financial stability and near- and long-term success.  Indeed, in the year between Mallinckrodt's emergence from bankruptcy and the filing of the Company's second prepackaged bankruptcy petition in August 2023, the Company and Defendants did not disclose the significance of the Company's liquidity issues, that the Company could not make scheduled debt payments, or that it was unlikely to continue operating as a going concern.

20.    Rather, throughout, the Company and Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Mallinckrodt, including through and at the direction of Defendants, misrepresented its financial position, including relating to its liquidity, ability to pay its debts, and purported enhancements to its liquidity and balance sheet.  Defendants knew or recklessly disregarded that the Company's, and their own, statements were false and misleading.

21.    Plaintiffs bought Mallinckrodt stock in reliance on these and other false and misleading public statements, which were reinforced in private conversations with Defendants. Plaintiffs continued to substantially hold this stock through the bankruptcy filing.  As holders of Mallinckrodt equity securities, Plaintiffs suffered damages from Defendants' wrongful conduct for which Plaintiffs are entitled to relief under federal and state law.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 and has supplemental jurisdiction over the New Jersey state law claims pursuant to 28 U.S.C. § 1367(a).

23.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and U.S.C. § 1391.  The acts and conduct described in this Complaint, including the dissemination of false and misleading statements and information, occurred in substantial part in this District.

24.     In connection with these acts, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States' mails, interstate telephone communications, and the facilities of a national securities exchange and market (the New York Stock Exchange American).

## PARTIES

25.     Plaintiff Alta Fundamental Advisors, LLC ("Alta"), is an investment manager located in New York, New York.  Alta-managed funds, including Plaintiffs Alta Fundamental Advisers Master LP ("AFAM"), Alta Fundamental Advisers SP LLC ("AFASP), Blackwell Partners LLC ("BP"), Star V Partners LLC, ("Star") (the "Funds"), collectively owned 1,947,093 shares of Mallinckrodt common stock.  Under the agreements between Alta and each of the Funds, Alta had investment authority and discretion for the Funds at all relevant funds. The Funds pay management fees to Alta based on the value of the assets managed.

26.     AFAM is a Cayman Islands exempted limited partnership.

27.     AFASP is a Delaware limited liability company.

28.     BP is a Delaware limited liability company.

29.     Star is a Tennessee limited liability company.

30.     Non-Party Mallinckrodt PLC is the parent company of a global pharmaceutical business consisting of multiple wholly owned subsidiaries, which are referred to herein collectively as "Mallinckrodt" or the "Company."  During the relevant period, Mallinckrodt's U.S.-based executive officers primarily resided in the Company's New Jersey offices, which are currently in Bridgewater.

31.     Defendant Paul Bisaro ("Bisaro") has served as the Chairman of Mallinckrodt's Board of Directors since June 2022.

32.     Bisaro and Defendant Olafsson previously worked together at Watson Pharmaceuticals ("Watson"), where Bisaro served as CEO.  Olafsson served as Watson's President of Global Generics, reporting to Bisaro, and was a member of that company's executive committee.  Bisaro was instrumental in the hiring of Olafsson as CEO after Mallinckrodt's emergence from the bankruptcy.  Olafsson emphasized his close working relationship with Bisaro at Watson at the start of his first quarterly investor conference for Mallinckrodt, which for the second quarter of 2022.  Olafsson stated that "[u]nder [Bisaro's] visionary leadership, we transformed [Watson] into a global- branded pharmaceutical leader." According to Olafsson, his experience with Bisaro "will be deeply beneficial to our work to put Mallinckrodt on the path to long-term value creation."

33.     Defendant Jason Goodson ("Goodson") is Executive Vice President and Chief Strategy and Restructuring Officer at Mallinckrodt.  In this role he has "executive responsibility for overseeing corporate strategy, business development and business intelligence and is a member of Mallinckrodt's executive committee," according to the Company website, which describes Goodson as "a seasoned executive leader with a track record of navigating complex business issues and delivering on corporate strategy."  For the year immediately preceding the

Company's August 2023 bankruptcy filing, Goodson was Executive Vice President and Head of Corporate Development. Previously, Goodson was Vice President Business Operations and Chief of Staff to CEO and held finance and accounting roles going back to when he joined Mallinckrodt in January 2018, prior to the first bankruptcy filing.

34.     Defendant Sigurdur Olafsson ("Olafsson") has served as Mallinckrodt's Chief Executive Officer ("CEO"), President, and a member of its Board of Directors (the "Board") since June 2022. During the relevant period, Olafsson was based in New Jersey, first in offices in Hampton and then in Bridgewater with most of his executive management team.

35.     Defendant Bryan M. Reasons ("Reasons") has served as Mallinckrodt's Executive Vice President and Chief Financial Officer ("CFO") since March 2019. Throughout the relevant period, Reasons has had executive responsibility for the global finance function. Reasons was the Chief Financial Officer when Mallinckrodt filed for bankruptcy in 2020, continued in that role through the first bankruptcy, after the Company's emergence in June 2022, into and through the second bankruptcy filing in 2023, and remains the Chief Financial Officer today post the second emergence. Reasons is also based in Bridgewater, New Jersey.

36.     Defendant Daniel Speciale ("Speciale") served as Mallinckrodt's Global Controller and Chief Investor Relations officer from 2021 to 2023. Speciale had other investor relations roles at Mallinckrodt dating back to 2016, including Vice President, Restructuring and Investor Relations; Vice President, Finance and Investor Relations Officer; and Director, Investor Relations.

37.     Under Speciale's leadership, Mallinckrodt's investor relations function worked closely with management to prepare and disseminate information about the Company, such as press releases, presentations, and SEC filings and financial information, to stockholders,

potential investors, and financial analysts, such as Plaintiffs. Mallinckrodt directed "investors" to "look to the Investor Relations page of the website for important and time-critical information." Based on information and belief, Speciale played a key role in the preparation and dissemination of all the disclosures and public statements described in the Complaint prior to the Company's second bankruptcy filing in August 2022. Speciale left Mallinckrodt in 2024.

38.    Each of the Defendants possessed the power and authority to influence and control the contents of Mallinckrodt's SEC filings, press releases, and other market communications. Based on information and belief, Defendants were provided with copies of Mallinckrodt's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions at Mallinckrodt and their access to material information available to them but not to the public, Defendants knew or were negligent in not knowing the adverse facts specified herein and that these facts had not been disclosed to and were being concealed from the public, including Plaintiffs, and that Mallinckrodt's and Defendants' positive representations were materially false and misleading. Defendants thus are liable for the false statements and omissions described herein.

## SUBSTANTIVE ALLEGATIONS

### A. Background

39.    As described in its Form 10-K for fiscal year 2022, filed in March 2023, Mallinckrodt plc "is a global business of multiple wholly owned subsidiaries … that develop, manufacture, market and distribute specialty pharmaceutical products and therapies." Mallinckrodt "operate[s] … in two reportable segments": "Specialty Brands includes innovative specialty pharmaceutical brands" and "Specialty Generics includes niche specialty

generic drugs and active pharmaceutical ingredients."

**B.  Mallinckrodt's 2020 Bankruptcy**

40.     In its quarterly report for the second quarter of 2020, filed on August 4, 2020, Mallinckrodt disclosed that the enormous liability it faced arising from its Acthar drug, including relating to Medicaid rebates and payment of illegal kickbacks, and its sale and marketing of opioid products "raised substantial doubt about the Company's ability to continue as a going concern."

41.     On October 12, 2020, Mallinckrodt plc and substantially all its U.S. subsidiaries at that time filed for bankruptcy in the U.S. Bankruptcy Court for the District of Delaware.

42.     The premise of the plan Mallinckrodt advocated for in this bankruptcy was to manage the Company's exposure to the opioid and Acthar liabilities in a way that would allow the Company to emerge and operate as a going concern over the long-term.  First, as to its opioid exposure, Mallinckrodt would make $1.725 billion in deferred payments to "Opioid Trusts" over a period of eight years (the "Opioid Settlement").  The payment schedule would kick-off with one $450 million payment upon Mallinckrodt's emergence from bankruptcy, followed by payments of $200 million on the first and second anniversaries of Mallinckrodt's emergence.  Additional annual payments would follow.  As to Acthar, Mallinckrodt would make $260 million in payments over seven years.  The plan also called for the reduction of the Company's other debt, including involving its credit and loan facilities and outstanding notes.

43.     Plan confirmation was hotly contested.  During that process, Mallinckrodt's Randall Eisenberg of Alix Partners testified on behalf of the Company.  He testified that the proposed plan would maximize value for stakeholders receiving distributions, was not likely to be followed by liquidation or a need for further reorganization and would not leave the

reorganized debtor with an unreasonably small amount of capital to operate. Eisenberg relied on the "First Plan Forecasts," which projected net sales for Mallinckrodt of $2.2 to $2.4 billion adjusted earnings before interest, depreciation, taxes, and amortization ("EBIDTA") of $791 million to $820 million for the years 2022 to 2025. Eisenberg's testimony was key to approval of the bankruptcy plan.

44.    On February 3, 2022, the Bankruptcy Court confirmed the proposed plan. On April 27, 2022, the High Court of Ireland confirmed a Scheme of Arrangement.

45.    As part of the total $1.725 billion dollar settlement reached in this bankruptcy, upon Mallinckrodt's emergence, New Jersey's Acting Attorney General announced that the state would "receive approximately $30 million dollars, assuming no prepayment by the company." The Attorney General's release called Mallinckrodt "[h]istorically one of the nation's highest-volume opioid producers," having "manufactured more than 28.8 billion opioid pills between 2006 and 2012—nearly 38 percent of the opioid market share in the U.S. during that period." It described how "Mallinckrodt aggressively marketed its various opioid products while downplaying the addiction and other risks associated with them. The company also funded ostensibly 'independent' third-party groups and distributed purportedly 'objective' literature that promoted opioid use while ignoring or minimizing the potential harms." In sum, according to the Attorney General's release, "Mallinckrodt aggressively pushed its opioid products in the marketplace while using misleading and deceptive messaging about the safety of those products to gain consumer confidence," with knowledge that its "pills … were often being diverted into illicit channels."[3]

---

[3] Matthew J. Platkin, Acting Attorney General, *Acting AG Platkin Announces Mallinckrodt Bankruptcy Plan Goes Effective, Resulting in Over a Billion Dollars for New Jersey and Other Public Creditors to Use toward Opioid Abatement*, Office of the Attorney General for the State of New Jersey (June 30, 2022),

C.  **Mallinckrodt Projects Strength Upon Emergence**

46.    Defendants emerged bullishly from bankruptcy on June 16, 2022, with Olafsson now at the helm.  Reasons, who had been CFO since March 2019, remained in that position. Bisaro served as Chairman of the Board.  Goodson and Speciale received promotions.

47.    Mallinckrodt timely made its initial agreed-upon payments to the Opioid Trusts and on the Acthar settlements.  Following these payments, $1.535 million in future settlement payments remained to the Opioid Trusts, with the next payment of $200 million due in June 2023.

48.    Aware that the Company, with its recent history, was under a microscope, Defendants made it a point to assure investors of the Company's overall financial strength, stability, and prospects for near- and long-term success.  They spoke positively about the Company's liquidity and balance sheet.  Their sales pitch was strategic.  Defendants designed and made these assurances to attract institutional investors, such as Plaintiffs, and others, to invest in and hold the Company's equity.  Defendants' statements then and throughout in no way suggested that the Company was at risk of defaulting on its obligations - obligations that they had just proposed, agreed upon, and said they could satisfy as part of the bankruptcy plan - let alone the Company was at risk of a second bankruptcy filing.

49.    Defendants were motivated to attract investors to the restructured, reborn Mallinckrodt.  Substantial portions of their compensation were directly tied to the Company's stock price.  For example, according to the Company's disclosures, in 2022 Olafsson's base salary was $1.1 million and Reasons' base salary was $600,000.  The Company granted Olafsson 450,545 shares worth $4,580,263, and Reasons 225,273 shares worth $2,290,137.

---

https://www.njoag.gov/acting-ag-platkin-announces-mallinckrodt-bankruptcy-plan-goes-effective-resulting-in-over-a-billion-dollars-for-new-jersey-and-other-public-creditors-to-use-toward-opioid-abatement/.

Thus, these stock holdings made up the vast majority of the compensation of Olafsson, the CEO

and Director, and Reasons, the CFO.  If Mallinckrodt filed for bankruptcy before these shares

vested and/or were sold, the shares would likely be worthless.  Olafsson and Reasons stood to

lose approximately 80% of their anticipated compensation in that case.  Bisaro beneficially

owned 5,000 shares in the Company.[4]  All in all, Defendants were heavily incentivized to make

the market believe that the Company was in good long-term health, and certainly was not in

danger of insolvency or another bankruptcy filing, until they could secure replacement of these

equity interests or otherwise position themselves for a financial windfall. And that is what they

did.

50.     Defendants made statements consistently telling and leading investors to believe

that the Company was solvent, meeting, or exceeding expectations, and thus able to fulfill the

bankruptcy plan and not in any danger of filing for bankruptcy again.  Defendants' positive

assurances to investors continued until after they secured bonus payments exceeding their

salary and substantial equity stakes in Mallinckrodt.  As detailed below, only then, in June

2023, after news started to filter out, did Defendants alert the market that Mallinckrodt was in

dire straits and on the cusp of returning to bankruptcy.

**MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED**

51.     As described throughout, Defendants made and are responsible for numerous

false and misleading public statements regarding Mallinckrodt's financial condition and

business prospects.  These misrepresentations were made in press releases, SEC disclosure

documents, investor conference calls, direct communications with Alta, and by other means.

---

[4] The Company does not appear to have disclosed the compensation of Goodson and Speciale.  Nonetheless, based on their positions with the Company, it is apparent that equity was a significant portion of their compensation, as with that of the other Defendants.

The materially false and misleading statements increased or maintained the price of Mallinckrodt's securities, including the securities held by Plaintiffs, and induced Alta to purchase and retain Mallinckrodt stock for the Funds.

52.     Throughout, Defendants presented Mallinckrodt as a profitable, growing, unique, and sustainable business.  The truth was vastly different, as they knew or should have known.  Defendants misrepresented Mallinckrodt's financial strength, including purported enhancements to its liquidity and balance sheet following its emergence from Chapter 11 bankruptcy protection and Mallinckrodt's ability to timely make one or more payments to the Opioid Trusts as required.  The Company was at an undisclosed and greatly increased risk of having to again file for Chapter 11 bankruptcy protection.

A. **June 2022 – Emergence From Bankruptcy**

53.     On June 16, 2022, Mallinckrodt issued a press release entitled "Mallinckrodt Emerges from Chapter 11 with Strengthened Balance Sheet and Enhanced Financial Flexibility."  In that release, Olafsson - in his first official public statements as CEO - assured investors that "Mallinckrodt is emerging from its recent restructuring process with an attractive pipeline, enhanced financial flexibility and significant opportunities to drive stakeholder value."  Bisaro represented that "today marks a new beginning for Mallinckrodt as we emerge well-positioned for long-term success, with a substantially stronger capital structure and major litigation matters permanently resolved."

54.     In sum, the Company's CEO and the Company's Chairman of the Board of Directors' first messages to the public upon emergence from bankruptcy were designed to, and did, convey that the Company's troubles were in the past and that the Company was "well positioned for long- term success," with "enhanced financial flexibility," "significant

opportunities to drive stakeholder value," and a "substantially stronger capital structure." Defendants communicated to investors that Mallinckrodt had the financial resources to satisfy its commitments under the bankruptcy plan, including making scheduled payments to the Opioid Trusts, to continue to operate as a going concern, and was certainly not in danger of another restructuring and bankruptcy filing. These statements were false and misleading, however, because Defendants had overstated Mallinckrodt's financial strength, including purported enhancements to its liquidity and balance sheet, and Mallinckrodt's ability to and the ramifications of it failing to timely make Opioid Settlement payments.

55.    Alta purchased Mallinckrodt common stock for the Funds on June 30, 2022; July 6, 7, 8, 11, 12, 13, 14, 18, 20, and 22, 2022; and August 4, 2022, in reliance on the Company's and Defendants' statements. Had the Company and Defendants told the truth, Alta would not have made these purchases of these securities for the Funds.

**B. August 2022 – Second Quarter Disclosures**

56.    Defendants' public statements in connection with the Company's Second Quarter of 2022 continued to tout the Company's stability, growth, and profitability. More falsehoods.

57.    On August 11, 2022, Defendants issued its quarterly press release. Olafsson is quoted in this release remarking that:

> While the Company has faced many challenges, we have a strong foundation and significant potential … Mallinckrodt today benefits from significant liquidity, meaningful cash flows from operations, a solid U.S. commercial platform and competitive positioning in Critical Care and Immunology. While we have work to do, the foundational pieces are in place to stabilize the core brands and return the business to sustainable growth and profitability over time.
>
> * * *
>
> As we work to chart Mallinckrodt's path forward, our near-term priorities

19

include strengthening the Company's balance sheet and continuing to generate strong cash flow; stabilizing our portfolio and maximizing opportunities for our in-market products; and investing strategically in our pipeline with a focus on potential cash contribution and return on investment. We're confident that by executing on our plans, we can create long-term value for our stakeholders while improving outcomes for patients with severe and critical conditions.

58.     In this release, Reasons stated, in the same vein, that:

Having eliminated more than $1.3 billion in debt principal and closed a new $200 million accounts receivable financing facility with the overhang and expense of the opioid litigation now behind us, we have a clear path forward to continue operating the business in a responsible manner and delivering benefits to patients. Looking ahead, we are focused on further reducing debt as we continue enhancing operating efficiencies and generating additional cash through the successful execution of our strategic priorities.

59.     On Mallinckrodt's quarterly investor call, also on August 11, 2022, Olafsson continued this false messaging touting Mallinckrodt's strength as it emerged from bankruptcy. He stated that "a lot of work has been done already to establish a strong foundation in the business, which is underpinned by significant liquidity, meaningful cash flows from operation, a solid U.S. commercial platform and competitive positioning in critical care and immunology." Olafsson also assured investors that, "I wouldn't be here speaking with you today [if I] didn't have every confidence in Mallinckrodt's ability to create value for shareholders and make a positive impact on patients' lives every day."

60.     Later in the Call, Olafsson said:

I want to restate that Mallinckrodt today has a strong foundation underpinned by significant liquidity, meaningful cash flows from operation, a solid U.S. commercial platform and competitive positioning in critical care and immunology. And while we still have challenges ahead, I believe we are well equipped to meet them. We have a clear path forward to stabilize the business by executing our near-term priorities and the top priority for me will be to reenergize our teams and helping to reinduce our stakeholders to Mallinckrodt.

These efforts truly go hand in hand. Finally, the more I've learned about the company, the further my conviction has become that Mallinckrodt has a strong future rooted in an unwavering focus on improving outcome for patients.

61.    Defendants, by these statements, communicated to investors that Mallinckrodt had the financial resources to satisfy its obligations, including by making required payments to the Opioid Trusts, to continue operating as a going concern, and was certainly not in danger of filing for bankruptcy.  These statements were knowingly false and misleading, however. Defendants had overstated Mallinckrodt's financial strength, including purported enhancements to its liquidity and balance sheet and Mallinckrodt's ability to timely make one or more payments pursuant to the Opioid Settlement.  As a result of the foregoing, the Company was at an increased risk of having to file for Chapter 11 bankruptcy protection again.

62.    Reasons signed the Company's Form 10-Q filed on August 11, 2022.  This 10-Q represented that Mallinckrodt "will make [a] payment[] of $200.0 million . . . inclusive of interest, related to our opioid . . . related settlement[] upon the one-year anniversary of the [June 16, 2022] Effective Date"—i.e., by June 16, 2023.  This 10-Q made clear that Mallinckrodt could and would make all nine payments over eight years to the Opioid Trusts consistent with its obligations, including "a $200.0 million payment upon each of the first and second anniversaries of the Effective Date."

63.    These statements were also false and misleading.  Defendants knew that Mallinckrodt lacked or was at severe risk of lacking the financial resources to make its opioid settlement payments as soon as June 2023.  The ramifications of failing to make the required payments were dire, as Defendants knew.

64.    Appended as an exhibit to the 10-Q certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), Olafsson and Reasons certified that the 10-Q "fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the [Exchange Act], as amended, and that the information contained … [therein] fairly presents, in all material respects, the

financial condition and results of operations of the Company." These statements were false and misleading because this 10-Q falsely communicated to or gave investors the misimpression that Mallinckrodt was positioned to pay all its obligations as they came due and continue as a going concern. Thus, it did not "fairly present[], in all material respects, the financial condition and results of operations" of Mallinckrodt.

65.    Alta purchased Mallinckrodt common stock for the Funds on August 11, 2022, August 17, 2022, September 16, 2022, and November 7, 2022, in reliance on the Company's and Defendants' statements. Had the Company and Defendants told the truth, Alta would not have made these purchases of these securities for the Funds.

**C.    October 2022 – Mallinckrodt Receives Approval to Re-list Shares and Re-hires its Restructuring Advisors**

66.    On October 24, 2023, Mallinckrodt issued a press release announcing that it had received "approval to List on NYSE American." In this press release, Olafsson offered strong, knowingly false commentary regarding the Company. He said: "Our listing on NYSE American marks an important step toward executing on our strategic priorities and business objectives. We are confident that Mallinckrodt is well positioned to drive sustainable growth and create long-term shareholder value while advancing therapies for underserved patients with severe and critical conditions." Olafsson said all this, knowing Mallinckrodt needed further financial restructuring. It is inconceivable that Olafsson, or the other Defendants, were "confident" that the Company was "well-positioned" for "growth" and building "long-term shareholder value."

67.    Mallinckrodt engaged Guggenheim Securities in 2019 with respect to the Company's debt and liquidity issues. The Debtors then retained Guggenheim after filing for bankruptcy in 2020. Guggenheim's engagement terminated upon Mallinckrodt's exit from

bankruptcy in June 2022. These Guggenheim engagements were headed by Guggenheim's co-head of the capital structure advisory group, an experienced restructuring practitioner.

68.     Guggenheim's separation from Mallinckrodt was stunningly short. Approximately four months after Mallinckrodt's exit from bankruptcy, as Mallinckrodt (via the Defendants) was singing a bullish tune to the market, it quietly re-engaged Guggenheim's restructuring team to address the Company's capital and debt structure, its ability to service its obligations, and "ultimately" engage with potential counterparties to negotiate a restructuring again, as explained by Guggenheim, after the fact, during the second bankruptcy case in September 2023.

69.     The re-retention of Guggenheim in late 2022 confirms that Defendants knew at that time the Company was at a minimum in need of significant balance sheet management and restructuring. In fact, the Company was already doing a deep dive into its liabilities at that time, assessing all avenues to address the related challenges and trying to alleviate internal concerns about the Company's ability to satisfy its obligations. These efforts would fail with growing challenges and deteriorating conditions over the next seven months. To be sure, none of the obligations Mallinckrodt tasked the Guggenheim restructuring team with analyzing and addressing were new, whether the Opioid Trust payments or looming debt maturities. Rather, they were all obligations that were part of the plan advanced by the debtors during the prior bankruptcy, that advisors contended was feasible through contested proceedings, and that existed when Mallinckrodt exited bankruptcy in June 2022. The Guggenheim team worked closely with Mallinckrodt, including Defendants, starting on or about October 1, 2022 (and continuing into what would be the second bankruptcy filing in August 2023).

**D.  November 2022 – Third Quarter Disclosures**

70.    On November 8, 2022, Mallinckrodt issued a press release announcing its third quarter 2022 financial results.  This release quoted Olafsson who reiterated that Company would be "continu[ing] (to) advance[e] our strategic initiatives and create long-term value for shareholders."  This remained knowingly false.  He also stated how in relevant part:

> We made important progress executing on our strategic initiatives, including . . . improving our balance sheet and strengthening the organization with key leadership appointments at the executive and board levels, adding deep commercial and human resources expertise.  More recently, we received approval and commenced trading on NYSE American, providing enhanced liquidity and access for our shareholders.

71.    Also on November 8, 2022, Mallinckrodt held its quarterly earnings call.  As always, Olafsson was unjustifiably bullish: "My first full quarter as a CEO reinforced my confidence in Mallinckrodt and the ability of our talented employees to build a great business and I believe we have the right plan in place to move forward successfully."

72.    On the call, Olafsson informed investors that Acthar was performing as the Company forecast when it emerged from bankruptcy.  Olafsson said, "[w]e are encouraged to see early signs of demand stabilization for Acthar Gel and performance in the quarter was consistent with our expectations."  Olafson did not say that this would also ultimately be irrelevant, because, as he knew, the Company could not satisfy its debt.

73.    Reasons was equally, unjustifiably positive.  He told the market that the Company's total net sales "were largely in line with our expectations."  He added that "[d]uring the quarter Acthar Gel contributed $126 million in net sales, which was consistent with our expectation and underscores our confidence that the asset to drive approximately $500 million in net sales in 2022."

74.    Olafsson further emphasized the Company's positive performance and financial

position:

> I want to reiterate my belief that Mallinckrodt today has a strong foundation underpinned by significant liquidity, meaningful cash flows from operations, a solid U.S. commercial platform, and competitive positioning in critical care and immunology.

> We're exactly where we said we would be last quarter and expect to deliver on our guidance for the full year. By executing on near term priorities, continuing to re-energize our organization, and delivering for stakeholders Mallinckrodt has a strong future ahead developing therapies designed to improve outcomes for patients.

75.    In what they said and what they did not say, Mallinckrodt and Defendants communicated that Mallinckrodt had the financial resources to satisfy its obligations and continue operating as a going concern.  These statements were knowingly false and misleading, however.  Defendants had overstated Mallinckrodt's financial strength, including purported enhancements to its liquidity and balance sheet, and Mallinckrodt's ability to timely pay its debts, including payments to the Opioid Trusts.  In fact, Mallinckrodt was at high risk of another significant restructuring transaction if not another bankruptcy filing.   In addition, by characterizing the plan Mallinckrodt was using as "the right plan in place to move forward successfully," Olafsson assumed a duty to disclose all related material facts, including that Defendants' projections for the Company's performance were not sufficient to enable the Company to fulfill its obligations.

76.    Also on November 8, 2022, Mallinckrodt filed its Form 10-Q for its third quarter which ended September 30, 2022.  The Company again wrote that it "will" make its $200 million payment to the Trusts for the Opioid Settlement by June 16, 2023; and indicated that Mallinckrodt could and would make all nine payments over eight years to the Opioid Trusts in a timely manner, while simultaneously downplaying the risk of the Company's default under applicable agreements.

77.     These statements were false and misleading because Mallinckrodt lacked or was at great risk of lacking the financial resources to make its payments to the Opioid Trusts and Defendants knew it or recklessly disregarded it.

78.     Again, Olafsson and Reasons certified that the 10-Q "fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the [Exchange Act], as amended, and that the information contained … [therein] fairly presents, in all material respects, the financial condition and results of operations of the Company."  These statements were false and misleading because this 10-Q falsely communicated to or gave investors the misimpression that Mallinckrodt could satisfy its obligations and continue as a going concern, and thus did not "fairly present[], in all material respects, the financial condition and results of operations" of Mallinckrodt.  They certainly did not give reason to believe that the business needed stabilizing, and the Company needed increased liquidity, and that the long-term viability of the Company was a concern due to the balance sheet as it existed upon emergence from bankruptcy but five months earlier.

79.     Alta spoke with Reasons and a senior member of Mallinckrodt's investor relations team on or about November 10, 2022.  Reasons' message was consistent with the Company's disclosures.

80.     Alta purchased Mallinckrodt common stock for the Funds on December 29 and 30, 2022; January 12, 13, 17, 18, and 31, 2023; and February 1, 2, 19, and 14, 2023 in reliance on the Company's and Defendants' statements.  Had the Company and Defendants told the truth, Alta would not have made these purchases of these securities for the Funds.

### E. **February 2023 – End of 2022 Fiscal Year Disclosures**

81.     On February 28, 2023, Mallinckrodt issued a press release announcing its fourth quarter and fiscal year 2022 financial results. Olafsson stated in the press release:

> We are pleased with our performance this quarter as we continued the steady execution of our strategic priorities . . .  We finished 2022 by exceeding our EBITDA guidance and achieving the high end of our net sales guidance for the year. We also increased cash on hand, reflecting our ongoing efforts to strengthen the balance sheet and optimize our cost structure.
>
> * * *
>
> In all, we believe Mallinckrodt is well-positioned to stabilize the business in the near term and achieve sustainable growth in the long term. We have made solid progress on our key initiatives and remain committed to advancing our business strategy while improving outcomes for patients with severe and critical conditions.

82.     That same day, Mallinckrodt held a call with investors to report the Company's 2022 full-year financial results.  Olafsson began that call by reiterating that Mallinckrodt "executed well and I'm incredibly proud of how we finished the year, exceeding our EBITDA guidance and achieving the high end of net sales guidance for the year," and "I wanted to kick things off with these positive results as they tie directly back to our strategic initiatives."

83.     Olafsson also touted to investors that "we have been focused on executing our three near-term strategic priorities, strengthening the balance sheet, stabilizing our portfolio, and making the right investments in our pipeline. We are beginning to see evidence of solid execution of these initiatives in the full year results."

84.     Olafsson stated further that "[w]e . . . believe our liquidity will allow us to continue making important investments in the business" and that "I am pleased with our efforts today and I have a great confidence in Mallinckrodt's long-term ability to drive value for stakeholders."

85.     Olafsson also advised investors that, "[w]e have some real opportunities ahead," and expressed his belief that "we are taking the right steps to mitigate these operational impacts, and we are seeing encouraging signs across both business segments."

86.     Reasons echoed that "we are incredibly proud of how we finished the year" and the Company's liquidity, debt, and performance "reflect[] the meaningful strides we've already made to strengthen our company."  He added that they "made a tremendous push in 2022 following our emergence to build a stronger company and positioned Mallinckrodt for the future, all while continuing to deliver high quality therapies to critically ill patients".

87.     On the call, an analyst asked about how the Company was "thinking about" the "opportunity to prepay" opioid settlement payments amounts "in concurrence with opportunities to buyback debt."  As was later revealed, the Company could not realistically prepay anything and knew it was likely it would not be able to make any payment when due in June 2023.  Yet, the answer gave no indication of the sort.  In response, after Speciale helped clarify the question, Reasons suggested the Company could prepay that opioid liability (and was able to address issues elsewhere in its capital structure as well, which was materially misleading):

> [W]e still have that opportunity, but we're looking at the capital structure holistically monitoring the capital markets. So, from a capital allocation, if that's the best return on our use of liquidity, we'll do that. But certainly, delevering in other areas of our cap structure have become very attractive as well right now.  So -- but we have 18 months from emergence to capture that discount.

88.     In these statements, Defendants were communicating to investors that Mallinckrodt had the financial resources to satisfy its debt and continue operating as a going concern.  These statements were knowingly false and misleading, however, because Defendants had overstated Mallinckrodt's financial strength, including purported enhancements to its

liquidity and balance sheet, following its emergence from Chapter 11 bankruptcy protection and Mallinckrodt's ability to timely make one or more payments to the Opioid Trusts, and because of the foregoing, the Company was at an increased risk of having to again file for Chapter 11 bankruptcy protection.

**F.   March 2023 – Mallinckrodt's Annual Report**

89.   On March 3, 2023, Mallinckrodt filed its annual report on Form 10-K, reporting the Company's financial and operational results for its fourth quarter and year ended December 30, 2022.  The 10-K again indicated that Mallinckrodt could and would make all nine payments over eight years to the Opioid Trusts in a timely manner, while simultaneously downplaying the risk of the Company's default under applicable agreements.

90.   These statements were knowingly false and misleading.  Defendants knew that Mallinckrodt lacked the financial resources to make its payments to trusts pursuant to the Opioid Settlement.

91.   The 10-K also contained representations designed to reinforce for investors that concerns about Mallinckrodt's ability to operate as a going concern were a thing of the past, and not of any concern going forward.  This was a lie.

92.   For example, in a disclosure regarding income taxes, the 10-K stated that, "Fiscal 2020 (Predecessor) includes a tax expense of $204.9 million for an increase to the valuation allowance on certain net deferred tax assets that were no longer more likely than not realizable due to the Company's former substantial doubt about its ability to continue as a going concern.  Additional valuation allowance impacts are netted within other line items, as referenced in the associated footnotes."

93.   Defendants reiterated this later in the 10-K:

During the period from January 1, 2022 through June 16, 2022 (Predecessor), the Company recognized a tax benefit of $600.8 million related to valuation allowances, consisting of $512.1 million of tax benefit for the reduction in the valuation allowance on the Company's deferred tax assets due to the alleviation of the previous substantial doubt about the Company's ability to continue as a going concern.

94.     Defendants made this representation for a third time later in the 10-K:

As of December 30, 2022 (Successor), due to the alleviation of the previous substantial doubt about the Company's ability to continue as a going concern, the associated valuation allowances were released through fresh-start accounting at emergence.

95.     In these statements, Defendants were explicitly communicating to investors that concerns about Mallinckrodt's ability to operate as a going concern were a thing of the past. Defendants knew this was untrue. The 10-K did not otherwise warn that the Company was at immediate risk of defaulting on its debt or filing for bankruptcy for a second time.

96.     The 10-K included a specific disclosure concerning "Risks Related to Our Emergence from Bankruptcy." None let investors know that Mallinckrodt was at immediate risk of defaulting on its debt or filing for bankruptcy for a second time. When the Company and Defendants chose to opine on the risks it faced when exiting from bankruptcy, it assumed a duty to make those statements complete and accurate. Mallinckrodt and Defendants violated this duty. These statements were knowingly false and misleading. Defendants had overstated Mallinckrodt's financial strength, including purported enhancements to its liquidity and balance sheet following its emergence from Chapter 11 bankruptcy protection, and inflated Mallinckrodt's ability to timely make one or more payments to the Opioid Trusts. Because of the foregoing, the Company was at an increased risk of having to again file for Chapter 11 bankruptcy protection.

97.     Olafsson and Reasons certified that the 10-K "fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the [Exchange Act], as amended, and

that the information contained in the [10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company." These statements were false and misleading because the 10-K falsely communicated to or gave investors the misimpression that Mallinckrodt could pay its debts and continue as a going concern, and thus did not "fairly present[], in all material respects, the financial condition and results of operations" of Mallinckrodt.

98.    Alta purchased Mallinckrodt common stock for the Funds on April 4, 2023, in reliance on the Company's and Defendants' statements. Had the Company and Defendants told the truth, Alta would not have made these purchases of these securities for the Funds.

99.    The Company's 2023 proxy statement issued on April 5, 2023, continued to tout the Company's financial health. It reiterated how the "emergence from Chapter 11 proceedings enables us to move forward as a diversified global specialty pharmaceutical company with a strengthened balance sheet and increased financial flexibility to invest in our business, execute our strategic initiatives, advance our pipeline and better meet the needs of patients." Alta spoke with Reasons and a senior member of Mallinckrodt's investor relations team on or about March 20, 2023. Reasons' message was consistent with the Company's disclosures. Based on the Company's disclosures and discussions with management, Alta understood that Mallinckrodt had succeeded in cleaning up its balance sheet with a reduced debt profile and was operating with a low leverage level without needing to address near-term maturities. This was obviously not the case and Mallinckrodt and Defendants knew that.

### G. <u>May 2023 – 2023 First Quarter</u>

100.    On May 9, 2023, Mallinckrodt issued a press release announcing its first quarter 2023 financial results.  The same day, Mallinckrodt hosted a call to discuss the Company's first quarter 2023 performance.  On the call, Defendant Olafsson reiterated that:

> "[w]e again increased our cash on hand, demonstrating that disciplined cost management and strengthening the balance sheet are top of mind in every decision we make" and that "[i]t is great to see further improvement on this front."

101.    Also, on the call, Olafsson did not give any indication that Acthar's sales presented a problem for the Company's bottom line or ability to operate as a going concern. Instead, Olafsson said, "[w]e remain confident in Acthar's long-term prospects, and we'll also continue to drive the submission of the Acthar next-generation delivery device, pending resolution of … regulatory matters we have previously mentioned."  Olafsson further assured investors that "while performance was essentially flat in the quarter from last year, we still anticipate the product will see sequential net sales growth throughout the year as it returns to a historical mid-single digit growth rates."

102.    On that same call, Olafsson touted that "Specialty Generics was a strong performer in first quarter, achieved double-digit growth versus the prior year and continued to be an integral part of the Mallinckrodt's business and an important diversification driver."  He also stated that "we are pleased to be able to reaffirm our full year net sales and adjusted EBITDA guidance despite the softer than expected Acthar performance. For Acthar, we now expect the sales to decline between 15% to 20% in 2023." He did not caution investors that this decline threatened Mallinckrodt's ability to fulfill the bankruptcy plan or continue operating as a going concern.  Instead, Olafsson said just the opposite: "[h]aving a well diversified business allows us to manage through these challenges and remain on track to deliver on our expectation

and our strategic goals." He continued, "[w]hile we still have to work – while we still have

work to do, our progress to date reinforces my confidence in Mallinckrodt's ability to drive a

long-term value while continuing to deliver for our patients."

103.    Olafsson concluded the call by telling investors that "Mallinckrodt began the

year well and I'm confident that we will continue to make good progress throughout 2023. I

can personally attest to the strides we have made across the company to put the business into a

stronger position for the future. While we need to stay intensely focused on our goals and

priorities, it gives me a great pride to see what our teams have already achieved. I look forward

to all that we will accomplish the remainder of the year for our patients and each other."

104.    Reasons sang the same tune. He highlighted the Company's "roughly $680

million in liquidity" including "cash and cash equivalents of $480 million" and "an undrawn

accounts receivable credit facility of up to $200 million." Reasons also flagged a new "interest

rate cap agreement during the quarter, which serves to reduce volatility on a portion of our

floating interest rate exposure." Reasons added that "we're pleased with the start of the year

for the business overall and our ability to reaffirm our 2023 net sales and adjusted EBITDA

guidance. We remain highly focused on improving our balance sheet in the months ahead."

105.    These falsely positive reports were reflected in Mallinckrodt's quarterly report

filed on May 9, 2023, and signed by Reasons. This 10-Q stated that Defendants "believe that

our sources of liquidity are adequate to fund our operations for the next twelve months and

foreseeable future." Defendants could not have or should not have believed this to be true as

filings during the second bankruptcy case show.

106.    By these statements, Defendants were communicating to investors that

Mallinckrodt had the financial resources to satisfy its obligations and continue operating as a

going concern. These statements were knowingly false and misleading. Defendants had overstated Mallinckrodt's financial strength, including purported enhancements to its liquidity and balance sheet, following its emergence from Chapter 11 bankruptcy protection and Mallinckrodt's ability to timely make one or more payments to the Opioid Trusts and because of the foregoing, the Company was at an increased risk of having to again file for Chapter 11 bankruptcy protection.

107.    Olafsson and Reasons certified that the 10-Q "fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the [Exchange Act], as amended, and that the information contained in the [10- Q] fairly presents, in all material respects, the financial condition and results of operations of the Company." These statements were false and misleading because the 10-Q falsely communicated to or gave investors the misimpression that Mallinckrodt could pay its debts and continue as a going concern, and thus did not "fairly present[], in all material respects, the financial condition and results of operations" of Mallinckrodt.

108.    By this time, however, according to Goodson's declarations in the bankruptcy case, the Company had been considering undisclosed "strategic alternatives." He stated that, because of concerns about Mallinckrodt's financial condition, Defendants "had caused the Company to begin considering alternatives for consensually extending its payment schedules and addressing its long-term obligations. The Company had engaged with certain lender constituents around potential refinancing options."

109.    Goodson's declaration also said that the Company "face[d] an imminent need to restructure" its financial obligations. When testifying at the bankruptcy confirmation hearing, Goodson could not or would not pin down when this "imminent need" arose. He did concede

that "the need … amplified" around the time of the first quarter earnings call, which was May 9, 2023.  This was not disclosed. Nor did the Company disclose, as Goodson acknowledged, that if the Company did not quickly restructure its financial obligations there would be significant problems.  Nor did the Company disclose an anticipated going-concern risk, which management, including Olafsson, Reasons, and Goodson, acknowledged.

110.    Goodson further admitted that the Company had been destined to "fall below a comfortable liquidity point."  Management knew, including "based on … experience in the past Chapter 11," as Goodson testified, "that operating under that kind of liquidity wall or those concerns of maturity would be rather difficult for employees, potentially our vendors. That would create more undue risk on the planned EBITDA, and so taking those cumulative views into place, it does make it unlikely, our ability to refinance the (2025 maturities)," dooming the Company.

111.    Yet, in connection with its first quarter 2023 disclosures, the Company did not say anything about an imminent need to restructure its financial obligations, the fact that if they failed to quickly restructure their financial obligations, there would be significant problems, and that the Company was looking at a going-concern risk for 2024.  The Company also did not say that it would be unable to operate if it paid its upcoming debts as they came due.  In truth, at this time, as the Company later admitted, the Company was about out of options, short of bankruptcy, to begin to address these issues as the Opioid Trusts and their advisors had been non-responsive to the Company's outreach and opportunities to refinance other debt had evaporated.

112.    On or about May 12, Alta spoke to Bisaro.  His message to Alta was consistent with the Company's disclosures.  It was knowingly false and misleading.

113.     Alta purchased Mallinckrodt common stock for the Funds on May 19, 2023, in reliance on the Company's and Defendants' statements.  Had the Company and Defendants told the truth, Alta would not have made these purchases of these securities for the Funds.

## MALLINCKRODT'S ACTUAL FINANCIAL CONDITION BECOMES PUBLIC

114.     In the many public disclosures and statements Mallinckrodt and Defendants made from the time the Company emerged from bankruptcy in June 2022 through and including those relating to the first quarter of 2023, they gave no indication of the Company's dire state. Defendants did not disclose that the Company was unable to meet its obligations, including payments to the Opioid Trusts, and was on the brink of re-entering bankruptcy, and/or was insolvent.  They knew this was all the case.  The Company's next payment of $200 million to the Opioid Trusts was due in June 2023.  Defendants had given no indication that the Company was likely to default on this next payment, but they all knew.

115.     Then, on June 2, 2023, less than a month from when Mallinckrodt reaffirmed its full-year 2023 financial guidance and otherwise gave a positive long-term outlook in its first quarter disclosures, *The Wall Street Journal* brought things to a head. It reported that "Mallinckrodt [wa]s considering options including a repeat bankruptcy filing after emerging from chapter 11 last year as a $200 million opioid settlement payment comes due within weeks … ."

116.     Only then, on June 5, 2023, did Mallinckrodt itself start to reveal the truth. Mallinckrodt disclosed that, nearly three weeks earlier, it began to "receive[] unsolicited letters on behalf of various parties holding substantial positions across the Company's capital structure."  Mallinckrodt explained that these letters "requested" that management and the Board "evaluate the Company's financial wherewithal and consider alternative options to meet

its financial responsibilities, including … consideration of alternatives to making the $200 million payment" to the Opioid Trusts on June 16, 2023.  The Company admitted that before receiving any of these letters it "had commenced preliminary discussions with the" Opioid Trusts "about alternatives to the existing payment structure for the opioid settlement."  The disclosure concluded that the "Board is actively evaluating this situation and considering options, including transactions that have been proposed by the Holders and other Company stakeholders, as well as the viewpoints of the various parties in interest," and that "[o]n June 2, 2023, the Board directed management and the Company's advisors to continue analyzing various proposals and engaging in discussions with various parties related to these options and viewpoints."

117.    Mallinckrodt's stock price fell $0.98 per share, or 40%, to close at $1.47 per share on June 5, 2023.

118.    Then, on June 15, 2023, Mallinckrodt filed a Form 8-K, in which it disclosed that it would not be making interest payments on its "(i) 11.500% First Lien Senior Secured Notes due 2028 … and (ii) 10.000% Second Lien Senior Secured Notes due 2029" and might need to file for bankruptcy in the near-term.  The Form 8-K described the devastating ramifications of an event of default from non-payment of interest on these notes.

119.    Mallinckrodt's stock price fell another $0.39 per share, or 30.95%, to close at $0.87 per share.

120.    On June 23, 2023, Mallinckrodt filed another Form 8-K in which the Company disclosed that the Board had "approved," on June 14, "a variety of actions and programs focused on executive retention and incentive matters" in anticipation of a potential bankruptcy filing.  These "actions and programs" meant that Defendants would not suffer any financial

consequences when the Company filed for bankruptcy. These "actions and programs" meant that instead of suffering financial consequences (let alone lose their jobs for leading the Company to commit to its second bankruptcy in about a year), Defendants stood to emerge in markedly better financial condition than before.

121.    The "actions and programs: included a Key Employee Retention Plan ("KERP") for certain of its key officers. The KERP provided for bonuses equal to 150% of base salary simply for remaining with the company through the earlier of the confirmation of any plan in a second bankruptcy or June 14, 2024. Under the KERP and KEIP, Reasons received bonuses of 150% of his base salary, as well as a guarantee of substantial portions of their previously awarded short- and long-term bonuses. Olafsson opted out of KERP and KEIP but negotiated to keep his short-term incentive award, which was 135% of his base salary.

122.    The Board also approved a Key Employee Incentive Plan ("KEIP") for certain of its key officers to replace the company's existing short-term and long-term cash incentive plans. The KEIP entitled awards of up to 100% of their previous short-term incentive target bonus and 60% of their previous long-term incentive target bonus, up to a maximum amount of 150% of the total bonus targets.

123.    The additional compensation and equity awards more than compensated for the share grants that would be extinguished in another bankruptcy filing.

124.    Mallinckrodt's stock price fell another 15.6%, to close at $1.29 per share on June 22, 2023.

125.    On August 23, 2023, Mallinckrodt announced the signing of agreements to file a "prepackaged" bankruptcy.

126.    On August 28, 2023, before markets opened, Mallinckrodt filed for bankruptcy

and trading of its stock was halted on the NYSE American. The prepackaged bankruptcy plan would (and ultimately did when confirmed) cancel the existing shares, including those held by the Funds. and issue new shares to certain creditors. At the end of the day, with the bankruptcy filing, Mallinckrodt stock, including the shares purchased and held by the Funds, lost all its value.

127.    The new bankruptcy plan included a Management Incentive Plan ("MIP") that contemplated rewarding directors and officers of the reorganized entity with up to 10% of the new equity, estimated to be worth at least $100 million. The MIP represented a new equity award beyond the KERP and KEIP. Throughout the bankruptcy, Olafsson, Reasons and Bisaro perpetuated the ruse that they had no idea whether they would remain with the Company post-emergence, and what if any MIP award they would each receive. This was a farce as reflected in Bisaro's continuation on the Board and the continued employment of and awards to Olafsson and Reasons following emergence.

128.    The bankruptcy court approved the plan on October 4, 2023.

129.    Mallinckrodt's filings during the bankruptcy attributed the Company's collapse to "significant unanticipated business developments, adverse economic conditions, and a market environment that the Company anticipates may prevent it from timely refinancing $817 million of upcoming debt maturities in 2025."

130.    These filings blamed Mallinckrodt's failure on "a setback to the launch of an important new Acthar-related device, stronger competition for Acthar, a slower-than-expected rebound in Therakos sales, and a rapid rise in interest rates on" Mallinckrodt's "variable rate debt." The filings acknowledged that "the Company continues to perform in line with its 2023 guidance," but nevertheless claimed that "the escalation and persistence of high interest rates

have absorbed increasingly more cash flow" that made debt payments impossible to fulfill.

131.    Contrary to these statements, the events that purportedly caused the Company to become insolvent— "a setback to the launch of an important new Acthar-related device, stronger competition for Acthar, a slower-than-expected rebound in Therakos sales, and a rapid rise in interest rates on" Mallinckrodt's "variable rate debt"—were or should have been anticipated.    Mallinckrodt's filings and public reports during the time between when Mallinckrodt emerged from bankruptcy in 2022 and announced the second bankruptcy in August 2023 demonstrated that the Company had been performing exactly as forecasted. The Company's descent back into bankruptcy was hardly the result of unforeseen market circumstances that evolved over time.    In truth, Mallinckrodt had virtually no hope of ever satisfying its debts when coming out of its first bankruptcy without significant further restructuring efforts (as demonstrated prominently by the re-hiring of Guggenheim in October 2022).  Defendants knew, or recklessly disregarded, that this was so.

132.    A *Bloomberg Law* article published two days after Mallinckrodt filed for bankruptcy in August 2022 stated that, contrary to Defendants' claim that they had been caught off guard by Acthar's poor sales, "Acthar Gel sales had been struggling for years."[5] Nor was stronger competition for Acthar unforeseen.

133.    During the August 2022 investor call, Speciale had stated that, "I think one of the comments that we made today was really just try to set an expectation for Acthar for the remainder of 2022 or 2023, maybe in totality and—so we referenced specifically, an approximately $500 million mark for that product this year." The Company met this

---

[5] Evan Ochsner, *Mallinckrodt's Second Bankruptcy 'Flagrant' Case of Bad Plan*, Bloomberg Law (Aug. 30, 2023, 5:00 AM), https://news.bloomberglaw.com/bankruptcy-law/mallinckrodts-second-bankruptcy-flagrant-case-of-bad-plan.

expectation, reporting in the 10-K, filed in February 2023, net sales of Acthar of $516 million.

134.    Defendants knew long before the end of 2022 that the new "injection device" for Acthar would not be available in 2023.  During the Q3 2022 Call, in early November 2022, Olafsson apprised investors that "[w]e are encouraged to see early signs of demand stabilization for Acthar Gel and performance in the quarter was consistent with our expectations," but, as to the Acthar injection device, "[a]s we said last quarter, device development has been completed and we are ready to proceed with submission. However, a regulatory matter involving one of our partners remains ongoing, as a result, we do not anticipate the launch in 2023."  Neither at the time of this announcement, nor at any point thereafter until the Company filed for bankruptcy in August 2023, did Defendants ever suggest that Mallinckrodt's ability to operate as a going concern hinged on approval of any injection device for Acthar.

135.    Similarly, Defendants knew full well that interest rates were going to rise when Mallinckrodt was emerging from bankruptcy in June 2020. For example, on May 11, 2022, the Associated Press reported that "The unexpected persistence of high inflation has caused the Fed to embark on what may become its fastest series of interest rate increases in 33 years."  The article continued, "the Fed raised its benchmark short- term rate by a half-point, its steepest increase in two decades . . . [and] signaled that more such sharp rate hikes are coming."[6]

136.    A month later, the New York Times reported that "[t]he Fed raised rates by half a percentage point in May and officials had suggested for weeks that a similar increase would be warranted at their meetings in June and July if data evolved as expected," and revealed that

---

[6] Associated Press, *U.S. inflation hit 8.3% last month but slows from 40-year high*, POLITICO (May 11, 2022, 8:53 AM), https://www.politico.com/news/2022/05/11/inflation-april-price-increase-peak-00031696.

the Fed was considering the largest interest rate increase since 1994.[7]

137.     Not only were Defendants completely aware of what they would later characterize as unexpected events, but Mallinckrodt's performance was entirely consistent with Defendants' expectations.

138.     For example, during the August 2022 investor call, Reasons stated that the Company's guidance to investors predicted that "for the full year 2022, we expect to achieve total net sales of between $1.875 billion and $1.925 billion . . . [a]nd adjusted EBITDA of between $630 million and $660 million." These are not the figures Eisenberg had relied upon in the prior bankruptcy, as Defendants knew. Eisenberg had testified that the Company needed to reach annual net sales of $2.2 billion to $2.4 billion and adjusted EBITDA of $791 million to $820 million. Mallinckrodt and Defendants never disclosed to investors the ramifications of this shift on the Company's ability to remain solvent, and pay the Opioid Trusts and its other obligations, let alone continue as a going concern. Instead, Mallinckrodt and Defendants said the financial forecasts behind Eisenberg's testimony and the Court's approval of the bankruptcy plan did not matter.

139.     Over the next several months the Company met its new guidance. Mallinckrodt disclosed financial results for the full year 2022: net sales of $1.914 billion and adjusted EBITDA of $674.9 million. The Company hit the benchmarks it had set for itself upon emerging from bankruptcy with full knowledge of, among other things, increased competition for Acthar, delays in Acthar's injectable device, and increasing interest rates.

140.     Mallinckrodt's 2023 guidance forecast total net sales in 2023 of between $1.700

---

[7] Jeanna Smialek, *The Fed May Discuss the Biggest Interest Rate Increase Since 1994*, NY TIMES (June 13, 2022), https://www.nytimes.com/2022/06/13/business/fed-interest-rate-increase.html?searchResultPosition=28.

billion and $1.820 billion, with adjusted EBITDA of $510 million to $560 million. Defendants reaffirmed this guidance without any changes, multiple times. They reassured investors that the Company's financial condition and liquidity had improved, in that the Company had $480 million of cash on its balance sheet, up $75 million from the end of 2022, had around $200 million available to be drawn under a bank line of credit, and was not in default on any debts. Accordingly, as far as the market knew, the Company was positioned to fulfill its obligations and had enough funds to keep operating for at least another 12 months.

141.    Mallinckrodt and Defendants never said that, as they knew, even if the Company performed as they were predicting, the Company was not going to survive without another significant restructuring.

142.    Defendants never advised investors that with projections hundreds of millions of dollars below the bankruptcy projections, even if the Company performed as expected, it would be effectively insolvent and could not fulfill its bankruptcy plan or continue operating as a going concern. Right away, management knew liquidity was and was going to be an increasingly significant issue. And management knew that if liquidity was not substantially addressed, the Company was destined to fail again.

143.    Instead, as noted, Defendants deceitfully instructed investors to ignore the projections it had used to convince the bankruptcy court to approve the bankruptcy plan. The Company's annual report on Form 10-K for 2022 included a risk factor that expressly advised investors that the forecasts relied on upon for the bankruptcy plan "were prepared solely for the purposes stated therein and have not been, and will not be, updated on an ongoing basis and should not be relied upon by investors." Defendants undertook to shield the fact that their own guidance indicated that the Company could not satisfy its financial obligations or continue

operating as a going concern.  Neither the Company nor any Defendant, despite having clear duties to do so, ever disclosed to investors that the Company was on a path to certain ruin that resulted in the August 2023 bankruptcy filing and a complete wipeout of equity investments.

144.    Defendants each knew, or were reckless in not knowing, the false and misleading nature of their and the Company's statements.  Defendants closely examined the Company's financial condition on an ongoing basis, including with Guggenheim Securities dating back to October 2022 and other advisors; Defendants engaged in regular liability management exercises and a top-to-bottom strategic review from the end of 2022 into spring 2023; and Defendants educated themselves on the Company's financial condition before repeatedly assuring investors that the Company was achieving its financial goals and could operate as a going concern.

145.    Defendants' motivations were obvious.  Defendants would suffer significant losses if the stock options they were awarded at the end of the first bankruptcy were extinguished if the Company filed for bankruptcy too quickly after it emerged, when creditors were unlikely to reward Defendants for steering the Company back into bankruptcy so quickly.  So, to secure a payout from creditors through a second bankruptcy process, Defendants maneuvered their collapsing Company to benefit these creditors prior to and following the Company's bankruptcy filing.  Doing so required keeping existing and prospective holders on board sufficiently long to position themselves for remuneration.  Defendants also needed to keep the truth from emerging for at least 180 days to avoid the potential of revocation of approval of the bankruptcy plan pursuant to 11 U.S.C. § 1144.

## DEFENDANTS' FINANCIAL INTERESTS

146.    As described above, Defendants faced large losses they could avoid by concealing the truth about Mallinckrodt's ability to operate as a going concern.  Defendants thus were heavily incentivized to report to the market that the Company was operating successfully, and not in danger of filing for bankruptcy, at least until they could find a way to replace the equity interests that would be obliterated if the Company filed bankruptcy again, which they did.

147.    Mallinckrodt pretended throughout its bankruptcy that the question of who would fill key roles was open.  To no one's surprise, on February 2, 2024, Mallinckrodt announced that Bisaro would be Chairman of the Board of Directors, and that Olafsson would remain as Mallinckrodt's CEO and continue to serve as a director.  Bisaro "was entitled to receive an annual retainer of $150,000, with an additional annual retainer of $100,000 … [as] the Chair of the Board.  He could also receive additional bonus retainers for committee and committee chair service, and "participate in [a] Stock Incentive Plan and Transaction Incentive Plan."[8]

148.    Olafsson entered into a new employment agreement by which he "would continue to serve as Mallinckrodt's President and Chief Executive Officer."  In addition to receiving the same annual base salary and annual incentives as before the bankruptcy, Olafsson was "granted a one-time equity award," made "a participant in the Transaction Incentive Plan," and a granted the "right to terminate for Good Reason if, in the long-term incentive plans

---

[8] On February 2, 2024, the Board also "adopted a Transaction Incentive Plan intended to compensate designated executive officers and directors with bonus payments to be made upon the consummation of qualifying asset sale transactions or a Change of Control."   Olafsson was designated as a 31.75% and Reasons as a 7.5% participant under this plan. Bisaro was "entitled to receive 5% of the benefits under the plan," with the rest of the Board and other management team members receiving amounts as well.

established by the Board for fiscal years 2027 and beyond, Olafsson does not receive incentive compensation with a target value of at least $7,000,000 per year, subject to the vesting, performance and other terms and conditions established by the Board at the time, or if he receives less than 35% of the management pool established for long-term incentives." Olafsson also "receive[d] a sign-on bonus on or about February 9, 2024, in an amount of $6,588,970, which is consistent with the severance payment that Mr. Olafsson would have received on or about that date under his Prior Agreement if he were not continuing his employment."

149.    Reasons and other executives also would "participate in the Stock Incentive Plan and the Transaction Incentive Plan."

150.    On February 2, 2024, the Board also announced the adoption of "a new incentive plan for equity awards" as contemplated by the bankruptcy plan's MIP, reserving "an aggregate of 1,036,649 ordinary shares of Mallinckrodt … for the issuance of equity awards thereunder to employees and directors."  The Company explained the it was "grant[ing] equity awards to its executive officers and members of the Board in the form of "is a mix of one-third restricted stock units that vest in equal annual portions over three years (the "RSUs") and two-thirds performance stock units (the "PSUs"), 50% of which (the "Cash Flow PSUs") vest based on Mallinckrodt's attainment of aggregate adjusted operating cash flow targets for the three-year period of fiscal 2024 through fiscal 2026 (the "Performance Period") and 50% of which vest based on Mallinckrodt's attainment of total realized value targets measured at the end of fiscal year 2026 (the "Realized Value PSUs")."

151.    The "Equity Grants" awarded comprised of one-third RSUs and two-thirds PSUs.  They included grants to Olafsson of 246,205 and Reasons of 61,552.

152.    Bisaro "received an Equity Grant comprised of one-third RSUs and two-thirds

PSUs of 41,034 Ordinary Shares," as "Chair."

153.    News reports picked up on what went on here.  On December 14, 2023, *The Wall Street Journal* reported that Mallinckrodt and another pharma company had "both completed transactions that gave priority to the interests of their financial creditors over those of opioid victims and rewarded the companies' top executives with bonuses or accelerated compensation before filing for chapter 11."

## DEFENDANTS' MENTAL STATE AND NEGLIGENCE

154.    By virtue of their positions and responsibilities, Defendants each knew of the false and misleading nature of the statements discussed above, or at a minimum were reckless or negligent for not knowing these matters.  Defendants presented themselves to the investing public and Alta as knowledgeable and fully informed about these matters.  And they were, or were reckless if they were not, because Defendants were privy to all material information concerning the Company's financial condition, including its ability to satisfy its debts as they came due while continuing to operate as a going concern.

155.    From the Company's emergence from bankruptcy in June 2022, there was nothing more important than its ability to satisfy its obligations, including to the Opioid Trusts. That the Company was at great risk from the outset of being unable to do so was undoubtedly evident to everyone who had access to and responsibility for the Company's financials, including Defendants.  An inability to pay its debts as they came due would doom the Company. And Defendants knew that the Company could not do so and were untruthful about that fact. The Company would not survive once the projections underlying the first bankruptcy plan were quickly abandoned.  So, in response, Defendants engaged in a concerted scheme to keep things afloat sufficiently long enough to secure a payout from creditors through a second bankruptcy

Case 3:24-cv-09245-ZNQ-JTQ    Document 1    Filed 09/17/24    Page 48 of 62 PageID: 48

process.   Keeping the creditors on their side was the path to continued employment and lucrative compensation.   Defendants maneuvered their collapsing Company to benefit these creditors prior to and following the Company's bankruptcy filing.

156.    To be sure, among Defendants' primary responsibilities was serving as the Company's conduit and spokespeople to the market.   Defendants made themselves available to institutional investors and their advisors, such as Alta, for one-on-one question and answer sessions and discussions.   Defendants and the Company spoke regularly about its performance, financial condition, and debt-load.   Undoubtedly, Defendants and their reports knew or had access to all material information related to Mallinckrodt, including the material information that was improperly withheld and/or misrepresented to investors.   Defendants were active and culpable participants in the fraudulent scheme alleged herein.   Defendants knew of and/or recklessly disregarded the falsity and misleading nature of the information, which they caused to be disseminated to the investing public.   What is described herein could not have been perpetrated or occurred without the knowledge, recklessness, and/or negligence at the highest levels of the Company, including Defendants.

157.    Again, the Company has already publicly admitted that it materially mispresented its financial condition in connection with its earnings announcement and filings for the first quarter of 2023.   This admission independently supports a strong inference of conscious misbehavior and recklessness with respect to the Company's reporting of its financial condition and ability to satisfy its obligations throughout the relevant period.

**NO SAFE HARBOR**

158.    The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements alleged herein.   The

48

statements complained about were historical statements or statements of current facts and conditions at the time the statements were made. In addition, to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

159.    Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speakers knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of Mallinckrodt who knew that the statement was materially false or misleading when made.

## LOSS CAUSATION

160.    As described above, Defendants' wrongful conduct proximately and directly caused Plaintiffs' economic loss. Mallinckrodt's and Defendants' statements and material omissions either caused or were a substantial contributing factor in causing Mallinckrodt's stock to trade at an artificially inflated price during the relevant period.

161.    When the false and misleading nature of Mallinckrodt's and Defendants' statements became apparent to the market, Mallinckrodt's stock price plummeted.

162.    The corrective disclosures, revealing the artificially inflated price of Mallinckrodt shares, caused economic injury to Plaintiffs. No single disclosure was sufficient to fully negate the artificial inflation present in Mallinckrodt's common stock, because each single disclosure only partially revealed the concealed risks in Mallinckrodt's business. Moreover, Mallinckrodt's and Defendants' repeated misstatements and omissions after or even

in direct response to a corrective revelation further mitigated the corrective impact of any disclosure. The continued misrepresentations not only mitigated declines in the price of Mallinckrodt's publicly traded securities to artificially preserve some degree of inflation, but also directly induced Plaintiffs to retain their existing Mallinckrodt shares and purchase additional Mallinckrodt common stock even after certain corrective information had entered the market. The release of subsequent additional corrective information caused further price declines that caused additional injury to Plaintiffs.

## **<u>RELIANCE</u>**

163.    Plaintiffs relied upon the materially false and misleading statements alleged herein when purchasing Mallinckrodt common stock after the Company's emergence from bankruptcy in June 2022.

164.    In this case, there is a presumption of reliance established by fraud-on-the-market doctrine because: (i) Mallinckrodt and the Defendants made public misrepresentations or failed to disclose material facts; (ii) the misrepresentations and omissions were material; (iii) the Company's common stock traded in efficient markets; (iv) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and (v) Plaintiffs purchased Mallinckrodt common stock between the time Mallinckrodt and Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed without knowledge of the misrepresented or omitted facts.

165.    The market for Mallinckrodt's common stock was efficient for the following reasons, among others: (i) As a regulated issuer, Mallinckrodt filed periodic public reports with the SEC on a consolidated basis; (ii) Mallinckrodt regularly communicated with public investors via established market communication mechanisms, including through regular

disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services; (iii) Mallinckrodt was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force(s) and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and, (iv) Mallinckrodt's common stock was listed and traded actively on the NYSE American, a highly automated and efficient market.

166. Accordingly, the market for Mallinckrodt's common stock promptly digested current information regarding the Company and its subsidiaries from all publicly available sources and reflected such information in the prices of the Mallinckrodt common stock. Under these circumstances, Plaintiffs were injured by their purchases of Mallinckrodt common stock at artificially inflated prices, and the presumption of reliance applies.

167. Because Mallinckrodt and Defendants concealed or improperly failed to disclose material facts about the Company, Plaintiffs are entitled to a presumption of reliance.

168. In addition, Plaintiffs relied on Mallinckrodt's and Defendants' misrepresentations and material omissions when deciding whether to purchase Mallinckrodt common stock.

169. Plaintiffs made investment decisions, including through review and analysis of the Company's public disclosures and statements and when possible direct communications with management. Ultimately, Alta, on behalf of the Funds, made the decisions whether to purchase, sell, or hold shares of Mallinckrodt common stock for Plaintiffs. Alta analysts regularly evaluated individual companies, including Mallinckrodt, and were responsible for advising on whether to purchase, sell, or hold shares in those companies. Factors considered

included, among other things, Mallinckrodt's financial performance and an evaluation of Mallinckrodt's strengths, weaknesses, and opportunities. Plaintiffs relied on the analysis conducted by its analysts in deciding whether to purchase, sell, or hold shares.

170.    For instance, Plaintiffs reviewed and analyzed public filings and other statements, including investor call transcripts. Plaintiffs relied on this in purchasing Mallinckrodt shares for the Funds. Plaintiffs also had direct communications with Mallinckrodt, including with Reasons, Bisaro and Speciale. Plaintiffs believe that Olafsson and Goodson were aware of these direct communications and were aware of the content of Mallinckrodt's messaging in advance of these communications and were involved in their preparation.

### COUNT I
### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

171.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

172.    This Count is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

173.    Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or recklessly disregarded were misleading in that they misrepresented or omitted material facts necessary to make the statements made, considering the circumstances under which they were made, not misleading.

174.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made,

in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs related to the purchase and/or acquisition of Mallinckrodt common stock.

175.    Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as fraud and deceit upon Plaintiffs; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and throughout did: (i) deceive the investing public, including Plaintiffs, as alleged herein; (ii) artificially inflate and maintain the market price of Mallinckrodt securities; and (iii) cause Plaintiffs to purchase or otherwise acquire Mallinckrodt securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the actions set forth herein.

176.    As part of the above plan, scheme, conspiracy, and course of conduct, each of Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Mallinckrodt securities.  Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Mallinckrodt's finances and business prospects.

177.    In addition to the duties of full disclosure imposed on the Defendants attendant to their affirmative false and misleading statements to the public, Defendants had a duty under

SEC Regulations S-X (17 C.F.R. §210.01, et seq.) and S-K (17 C.F.R. §229.10, et seq.) to promptly disseminate truthful information with respect to Mallinckrodt's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the Company's revenue and earnings trends, so that the market prices of the Company's securities would be based on truthful, complete, and accurate information.

178.    By virtue of their positions at Mallinckrodt, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

179.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As senior officers and/or directors of Mallinckrodt, Defendants had knowledge of the details of Mallinckrodt's internal affairs.

180.    Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, Defendants were able to and did, directly or indirectly, control the content of the statements of Mallinckrodt.  In fact, Defendants personally made public statements for Mallinckrodt.  As officers and/or directors of a publicly held company, Defendants had a duty to disseminate timely, accurate, and truthful information

with respect to Mallinckrodt's businesses, operations, future financial condition, and prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Mallinckrodt securities was artificially inflated. In ignorance of the adverse facts concerning Mallinckrodt's business and financial condition which were concealed by Defendants, Plaintiffs purchased or otherwise acquired Mallinckrodt securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities, and/or upon statements disseminated by Defendants, and were damaged thereby.

181.    Mallinckrodt securities were traded on an active and efficient market. In reliance on the integrity of the market, Plaintiffs paid artificially inflated prices for Mallinckrodt common stock and experienced losses when the artificial inflation was removed from the stock because of the revelations and price declines detailed herein. Plaintiffs would not have purchased or acquired Mallinckrodt common stock at the prices they paid, or at all, if they had been aware that those prices had been inflated by Defendants' misleading statements and omissions. Had Plaintiffs known the truth, they would not have purchased or otherwise acquired said securities or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs, the true value of Mallinckrodt securities was substantially lower than the prices paid by Plaintiffs. The market price of Mallinckrodt securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs.

182.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly, or indirectly, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiffs.

183.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's securities upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

<u>**COUNT II**</u>
**(Violation of Section 18(a) of the Exchange Act)**

184.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein, except that as to this Count, Plaintiffs expressly disclaim any allegation of fraud or intentional misconduct except that any challenged statements of opinion or belief are alleged to have been materially misstated statements of opinion or belief when made. Such statements of opinion and belief include embedded misstatements of material fact and omitted facts necessary to make the opinion statements not misleading.

185.    As alleged above, Defendants filed or caused to be filed with the SEC documents regarding Mallinckrodt that contained misrepresented material facts and omitted material facts necessary to make the statements made, considering the circumstances under which they were made, not misleading.

186.    Prior to purchasing Mallinckrodt securities, Plaintiffs read Mallinckrodt's SEC filings, and relied upon the misstatements contained therein.

187.    Plaintiffs' reliance was reasonable. Plaintiffs read and relied upon these documents and financial statements not knowing they contained materially false statements and omissions.  Had Plaintiffs known the true facts, they would not have purchased Mallinckrodt common stock or would not have purchased it at the inflated prices they paid.  At the time of their purchases and acquisitions of Mallinckrodt common stock, Plaintiffs were not aware of the untrue statements and/or omissions alleged herein and could not have reasonably discovered

such untruths or omissions.

188.    Defendants' materially false or misleading statements artificially inflated the prices of Mallinckrodt common stock.  When the truth began to emerge about the false and misleading statements and omissions, the prices of Mallinckrodt common stock declined, and Plaintiffs were damaged.

189.    By virtue of the conduct alleged herein, Defendants each violated Section 18(a) of the Exchange Act and are liable to Plaintiffs.

## COUNT III
### (Violations of Section 20(a) of the Exchange Act Against Defendants)

190.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

191.    During their tenures as officers and/or directors of Mallinckrodt, Defendants were controlling persons of Mallinckrodt within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions of control and authority as officers and/or directors of Mallinckrodt, Defendants had the power and authority to cause Mallinckrodt to engage in the conduct complained of herein.  Defendants were able to, and did, control, directly and indirectly, the decision making of Mallinckrodt, including the content and dissemination of Mallinckrodt's public statements and filings described herein, thereby causing the dissemination of the materially false and misleading statements and omissions as alleged herein.

192.    Defendants participated in the operation and management of Mallinckrodt, and conducted and participated, directly and indirectly, in the conduct of Mallinckrodt's business affairs.  Because of their senior positions, they knew the adverse non-public information about Mallinckrodt's false statements.

193.    As officers and/or directors of a publicly owned company, Defendants had a duty to disseminate accurate and truthful information with respect to Mallinckrodt's financial condition and results of operations, and to correct promptly any public statements issued by Mallinckrodt which had become materially false or misleading.

194.    By reason of their management positions and/or being directors of Mallinckrodt, each of Defendants had the power to direct the actions of, and exercised the same to cause, Mallinckrodt to engage in the unlawful acts and conduct complained of herein. Each of Defendants exercised control over the general operations of Mallinckrodt and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs complain.

195.    In their capacities as officers and/or directors of Mallinckrodt, and as more fully described herein, Defendants participated in the misstatements and omissions set forth above. Defendants exercised their power and authority to cause Mallinckrodt to engage in the wrongful acts complained of herein. Defendants culpably participated in the wrongdoing described above.

196.    As set forth herein, Mallinckrodt violated Section 10(b) of the Exchange Act. By virtue of their positions as controlling persons, and because of their aforesaid conduct and culpable participation, Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as Mallinckrodt would be liable to Plaintiffs.

197.    By reason of the above conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Mallinckrodt and are liable to Plaintiffs.

<u>**COUNT IV**</u>
<u>**(Violation of New Jersey Uniform Securities Act)**</u>

198.    Plaintiffs repeats and re-alleges each and every allegation contained above as if fully set forth herein.

199.    The New Jersey Uniform Securities Law makes it unlawful for any person to offer or sell a security by means of any untrue statement of material fact or any omission to state a material fact.

200.    Defendants and/or other persons acting under their direction and control made untrue statements of a material fact and omitted to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, as described herein.

201.    Defendants made such statements with knowledge of the falsity of those representations and statements and with the intent that investors, including Plaintiffs, would rely on such misrepresentations of material facts.

202.    Defendants made these misrepresentations in connection with the offer and sale of securities.

203.    Defendants and/or other persons acting under their direction and control employed a device, scheme, or artifice to defraud Alta.

204.    Defendants and/or other persons acting under their direction and control engaged in acts, practices, or courses of business which operated as a fraud or deceit upon Plaintiffs.

205.    Defendants' violations caused damage to Plaintiffs as described herein.

## COUNT V
### (Common Law Fraud / Fraudulent Inducement)

206.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

207.    Each of the Defendants made, authorized, or caused the misrepresentations at issue, which are identified and summarized above. The material representations set forth above were fraudulent, and Defendants' representations fraudulently omitted material statements of fact.

208.    Each Defendant knew or recklessly disregarded that their representations and omissions were false and/or misleading at the time they were made. Each made the misleading statements with an intent to defraud Plaintiffs, as detailed above.

209.    Defendants had reason to expect that Plaintiffs were among the group of persons who would receive and rely on such representations and intended that their misleading statements and omissions would induce Plaintiffs to purchase Mallinckrodt securities.

210.    Defendants also spoke and made fraudulent statements directly to Plaintiffs.

211.    Plaintiffs justifiably relied on Defendants' false representations and misleading omissions in purchasing and holding Mallinckrodt securities, as detailed above.

212.    Had Plaintiffs known the true facts regarding Mallinckrodt's business as set forth above, it would not have purchased Mallinckrodt securities at the prices they paid and would have sold any securities purchased upon becoming aware.

213.    As a direct and proximate result of Defendants' actions, Plaintiffs have suffered damages in an amount to be proven at trial.

## COUNT VI
### (Negligent Misrepresentation)

214. Plaintiffs repeat and reallege each and every contained above as if fully set forth herein, except that as to this Count, Plaintiffs expressly disclaim any allegation of fraud or intentional misconduct except that any challenged statements of opinion or belief are alleged to have been materially misstated statements of opinion or belief when made. Such statements of opinion and belief include embedded misstatements of material fact and omitted facts necessary to make the opinion statements not misleading.

215. Defendants authorized or caused the representations and/or omissions set forth above to be made.

216. Defendants supplied false information for use by Plaintiffs in making an investment decision.

217. Defendants had direct communications with Plaintiffs and were aware that Plaintiffs were relying on their public statements in making their investment decision regarding Mallinckrodt.

218. Defendants understood Plaintiffs had a significant stake in Mallinckrodt. For example, Mallinckrodt repeatedly invited Plaintiffs to special events for a select group of Mallinckrodt investors.

219. Defendants, at least negligently, made misrepresentations to induce Plaintiffs to purchase Mallinckrodt securities.

220. Defendants breached their duty to exercise reasonable care in making these misrepresentations to Plaintiffs.

221. Plaintiffs justifiably relied on Defendants' false representations and misleading omissions in purchasing Mallinckrodt securities.

222.    Had Plaintiffs known the true facts regarding Mallinckrodt's business as set forth above, they would not have purchased Mallinckrodt securities at the prices they paid and would have sold any securities purchased upon becoming aware.

223.    As a direct and proximate result of Defendants' negligent misrepresentations, Plaintiffs have suffered damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.    Requiring Defendants to pay damages sustained by Plaintiffs by reason of the acts and transactions alleged herein;

B.    Awarding Plaintiffs prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

C.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: September 17, 2024                    Respectfully submitted,

**CLARK SMITH VILLAZOR LLP**

*/s/Rodney C. Villazor*
Rodney C. Villazor
Christopher J. Clark (*PHV* application forthcoming)
Jeffrey D. Rotenberg (*PHV* application forthcoming)
666 Third Avenue, 21st Floor
New York, New York 10017
Telephone: (212) 377-0850
Facsimile: (212) 377-0868
rodney.villazor@csvllp.com
clark@csvllp.com
jeffrey.rotenberg@csvllp.com
*Attorneys for Plaintiffs*